# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0448V
UNPUBLISHED

| | |
|---|---|
| LESLI AUTUMN AKERS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: August 30, 2021<br><br>Special Processing Unit (SPU); Findings of Fact; Onset; Lack of Prior Pain; Statutory Six-Month Requirement; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*William E. Cochran, Jr., Black McLaren Jones Ryland & Griffee, P.C., Memphis, TN , for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

## **FINDINGS OF FACT**[1]

On April 16, 2020, Lesli Autumn Akers filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving the influenza ("flu") vaccine on September 13, 2018. Petition at 1, ¶ 2. In the alternative, she maintains that her SIRVA was caused-in-fact by the flu vaccine. *Id.* Petitioner specifically asserts that

---

[1] Because this unpublished Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

her left shoulder pain began the evening of her vaccination, and that for at least seven months thereafter she continued to suffer pain when reaching overhead, engaging in strenuous activities, and sleeping. Exhibit 1 at ¶¶ 5, 7 (Petitioner's affidavit). The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination. Specifically, Petitioner suffered pain the same day as vaccination. Furthermore, I find Petitioner did not suffer left shoulder pain prior to vaccination, and suffered the residual effects of the left shoulder pain she experienced post-vaccination for more than six months.

I.     **Relevant Procedural History**

Within a month of filing the Petition, Ms. Akers filed her affidavit and the medical records required by the Vaccine Act. Exhibits 1-16, ECF Nos. 6, 9; *see* Section 11(c). Following the initial status conference, held on July 17, 2020, Respondent's counsel indicated he had not identified any outstanding medical records or factual issues which could be addressed while awaiting the Health & Human Services review. ECF No. 14. Petitioner provided a demand and supporting documentation to Respondent on March 23, 2021. ECF No. 18.

On May 25, 2020, Respondent filed a status report indicating that he intended to defend this case. ECF No. 20. In his Rule 4(c) Report, filed on July 23, 2021, Respondent argued that Petitioner's injury does not meet the definition for a Table SIRVA[3] because

---

[3] Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV) (2017). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;

2

she has failed to establish that her pain began within 48 hours of vaccination. Rule 4(c) Report at 8-9, ECF No. 21. Respondent also argued Petitioner has failed to satisfy the Vaccine Act's six-month severity requirement.[4] Rule 4(c) Report at 9-10. Specifically, he asserted Petitioner's left shoulder pain had resolved prior to a fall she experienced in January 2019, and all pain she suffered thereafter should be attributed solely to the effects of the fall. *Id.*

I have determined that a factual finding regarding the onset and duration of Petitioner's left shoulder pain is required in this case, and will assist in its ultimate disposition. The matter is now ripe for adjudication.

## II.     Issue

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and QAI for a Table SIRVA and whether Petitioner continued to suffer the residual effects of the SIRVA for more than six months. 42 C.F.R. § 100.3(a) XIV.B. (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI); Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

## III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.

---

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

[4] As stated by Congress when amending the Vaccine Act in 1987, the six-month severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–373. The only exception is the alternative added in 2000, a showing that the vaccine injury required inpatient hospitalization and surgical intervention. *Children's Health Act of 2000*, Pub. L. No. 106–310, § 1701, 114 Stat. 1101, 1151 (2000) (codified as amended at 42 U.S.C. § 300aa–11(c)(1)(D)(iii)). This exception was added to allow compensation in intussusception cases which often required surgical intervention but then resolved in less than six months. *Id.*

Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may

4

be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.     Findings of Fact

I make my findings regarding onset and severity after a complete review of the record to include all medical records, affidavits, additional evidence, and arguments set forth in Respondent's Rule 4(c) Report. Specifically, I base the findings on the following evidence:

- Prior to vaccination, the medical records from Petitioner's primary care provider ("PCP"), an urgent care clinic, show she suffered illnesses such as sinus congestion, a cough, chest congestion, and other less common symptoms such as difficulty breathing, a loss of consciousness, and abdominal pain. Exhibit 3 at 127-93. There are no entries from prior to vaccination describing pain in either shoulder or arm, however. *See* Exhibit 3.

- Petitioner did complain of left knee pain on May 2, 2017, right hand pain after an injury while wrestling on November 13, 2017, and six months of pain in her left pinky toe after an injury on June 30, 2018. Exhibit 3 at 186, 164, 134 (in chronological order). When experiencing a rash in March 2018 and concerned that she was suffering the same symptoms as her mother who had been diagnosed with lupus, Petitioner reported joint pain in her knees for several years. *Id.* at 150. Surgery was performed on Petitioner's toe on August 24, 2018. *Id.* at 123.

- The vaccine record shows Petitioner received the flu vaccine alleged as causal intramuscularly in her left deltoid on September 13, 2018. Exhibit 2 at 3-4. Petitioner was 26 years old when she received this vaccine. *Id.* at 4.

5

- On September 28, 2018 (fifteen days post-vaccination), Petitioner returned to her PCP complaining of frequent and painful urination, lower back pain, and a severe headache. Exhibit 3 at 122. Petitioner reported that her pain was moderate, rating her forehead pain as eight out of ten. *Id.* She was diagnosed with a urinary tract infection ("UTI"), prescribed medication, and administered a Toradol[5] injection in her right dorsogluteal[6] muscle. *Id.* at 124-25. There is no mention of left shoulder pain in the medical record from this visit.

- Less than a week later, on October 4, 2018, Petitioner returned to her PCP, now complaining of "intermittent muscle pain of the left upper arm since approximately 3 weeks ago." Exhibit 3 at 119. Petitioner attributed her pain to the flu shot she received at Walgreen's three weeks earlier, adding that she was "still having a lot of muscle pain in her left upper arm." *Id.* Petitioner reported that "she called Walgreen's and they told her to go to the doctor." *Id.* Rating her pain as three out of ten, Petitioner was administered a steroid injection. *Id.* at 119, 121.

- On October 11, 2018, Petitioner returned to her PCP, reporting that the steroid injection had relieved her left arm soreness for a week. Exhibit 3 at 116. Describing the soreness as constant, but mild, she again attributed it to the flu shot she received one month earlier. *Id.* She was prescribed Gabapentin. *Id.* at 118.

- Petitioner was seen again by her PCP on October 15, 2018 for sinus congestion and continued left shoulder pain. Exhibit 3 at 112. This time Petitioner described her pain as "aching" and indicated that the flu shot had been administered too high. *Id.* She was instructed to continue taking Gabapentin and provided a referral to an orthopedist. *Id.* at 114.

- Before seeing the orthopedist, Petitioner returned one more time to her PCP. Exhibit 3 at 108 (record from October 22, 2018 PCP visit). Reporting that her orthopedic appointment had been scheduled for early November, Petitioner described continued, constant pain in her left shoulder and hand tingling and numbness which did not improved with Aleve, Toradol, and over

---

[5] Toradol is the "trademark for preparations of ketorolac tromethamine." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1940 (32th ed. 2012). Ketorolac tromethamine is "a nonsteroidal anti-inflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain." *Id.* at 984.

[6] Dorsogluteal refers to the back of the buttock. DORLAND'S at 563, 792.

6

the counter Tylenol. She rated her pain level as "mild." *Id.* Upon examination, it was noted that Petitioner exhibited no left shoulder tenderness and normal range of motion ("ROM"), but tenderness over her left deltoid. *Id.* at 193. Petitioner was prescribed Tylenol with codeine and encouraged to seek an earlier orthopedic appointment. *Id.* at 193-94.

- Petitioner was first seen by the orthopedist on October 30, 2018. Exhibit 5 at 23. She reported pain in her left shoulder, over the AC joint, describing it as "burning, aching, and sharp." *Id.* In the medical record from this visit, it is noted that Petitioner "has not done anything to hurt herself that she knows of," and there is no mention of the flu vaccine she received six weeks prior. *Id.* Reviewing the x-rays taken at this visit, the orthopedist observed "some calcification in the dorsal capsule at the AC joint . . . [and] a little degenerative changes [sic] on the end of the clavicle." *Id.* He administered a steroid injection. *Id.*

- When Petitioner returned to the orthopedist, approximately one week later, she reported that her left shoulder pain had not improved. Exhibit 5 at 22 (record from November 8, 2018 orthopedic visit). Noting that Petitioner also reported pain over the left deltoid, the orthopedist administered a second steroid injection, sticking her left shoulder area twice. *Id.*

- Petitioner's next appointment with the orthopedist occurred more than two months later on January 17, 2019. Exhibit 5 at 21. In the record from that visit, it was noted that Petitioner "[wa]s still having some problems with her left shoulder." *Id.* After mentioning that he had administered a steroid injection at Petitioner's last appointment, the orthopedist noted that "[s]he is still having symptoms." *Id.* There is no mention of a fall in this record. The orthopedist prescribed physical therapy ("PT"). *Id.*

- The record from Petitioner's PT evaluation four days later, on January 21, 2019, indicated that her left shoulder pain began six months earlier on July 1, 2018. Exhibit 6 at 49. Petitioner reported that she had received relief from a steroid injection administered three months earlier, having no pain two and a half weeks ago, but her "shoulder started hurting again after falling and landing/catching [her]self with L UE." *Id.* Petitioner described her pain as sharp, ranging at levels from four to eight out of ten and exhibited decreased ROM in her left shoulder. *Id.*

- Petitioner attended three more PT sessions in January and early February 2019. *See, e.g.,* Exhibit 6 at 68. During these sessions, she reported pain

7

ranging at levels from zero to four. *Id.* at 71-79. In a summary dated March 21, 2019, it was noted that Petitioner "became sick, stated she would call to schedule more appointments, did not hear back from patient, unable to reassess prior to discharge." *Id.* at 79. Petitioner's discharge date is listed as February 1, 2019. *E.g., id.* at 54.

- On February 5, 2019, Petitioner returned to the orthopedist, complaining of a lack of improvement with PT. Exhibit 5 at 20. The orthopedist ordered an MRI. *Id.*

- During this time, Petitioner also was seen by a rheumatologist for a lupus evaluation. Exhibit 8 at 5. Citing several years of rashes, excessive hair loss, and fatigue, Petitioner reported that her PCP had ordered a test a year ago which "showed [a] positive antinuclear antibody [result]." *Id.* However, in the record it was noted that "[t]he results are not available for review." *Id.* Petitioner denied any joint pain or swelling except for left shoulder pain which she indicated had "just started recently" and was caused by a sprain. *Id.* However, in the record from a follow-up appointment to the rheumatologist on March 11, 2019, it is noted that Petitioner reported her joint pain started after a "flu shot . . . was actually injected into her left shoulder joint." *Id.* at 2.

- During this time, Petitioner was seen again by her orthopedist. Exhibit 5 at 19. At the February 25, 2019 appointment, it was noted that Petitioner's request for an MRI had been denied, and that "[s]he [wa]s still having the same symptoms in the shoulder." *Id.* Petitioner reported that she was seeing a rheumatologist and asked whether lupus "could involve her shoulder." The orthopedist replied in the affirmative and again ordered an MRI. *Id.*

- After the MRI results were shown to be normal, the orthopedist referred Petitioner to an orthopedic surgeon. Exhibit 5 at 18 (record from March 19, 2019 visit); *see id.* at 24 (results of the MRI, performed on March 14, 2019).

- The medical record from her first visit to the orthopedic surgeon on April 9, 2019, indicates Petitioner stated that "[h]er initial injury occurred in September when she was getting a flu shot." Exhibit 5 at 16. Reporting no improvement, Petitioner indicated that she had experienced shoulder pain "[s]ince that time." *Id.* Opining that Petitioner's injury may be due to lupus or "an injection-type syndrome," the orthopedic surgeon noted that the March 14, 2019 MRI "could have missed [a] rotator cuff tear that is partial or a

labral tear." *Id.* The surgeon remarked that MRIs typically miss 40 percent of known labral tears. She recommended that Petitioner continue conservative care and undergo another MRI and diagnostic arthroscopic surgery. *Id.*

- At her next appointment on April 17, 2019, the orthopedic surgeon noted Petitioner's lupus tests had been inconclusive. Exhibit 5 at 15. The surgeon stated "Ongoing left shoulder pain. She has had injection. She has had anti-inflammatory. She may have underlying lupus, but her tests have been inconclusive." *Id.* Indicating that Petitioner "has [had] significant discomfort now for over a year, failing injections and therapy," the surgeon discussed several treatment options with Petitioner. *Id.* Petitioner decided to undergo diagnostic surgery, expressing her understanding that the surgeon would perform any needed repairs during the surgery. *Id.*

- Performed on April 30, 2019, the arthroscopic surgery revealed anterior and posterior left shoulder labral fraying and biceps tenosynovitis. Exhibit 5 at 27. A left shoulder debridement, synovial biopsy, and open subpectoral biceps tenodesis were performed. *Id.* The biopsied benign tissue revealing "mild nonspecific chronic inflammatory and proliferative changes." *Id.* at 29.

- During the follow-up appointment with her orthopedic surgeon on May 7, 2019, Petitioner was prescribed PT. Exhibit 5 at 14. After attending 26 sessions, she was discharged from PT on August 23, 2019. Exhibit 7 at 13. At that time, she rated her pain as between zero and one. *Id.*

- When seen by her orthopedic surgeon on June 4, 2019, Petitioner reported a recent fall which appeared not to have damaged her shoulder repair. Exhibit 5 at 12. In an addendum to that visit, it was noted that Petitioner had experienced seizures and had recently passed out. The orthopedic surgeon referred her to neurology. *Id.* at 13.

The medical records reveal that Petitioner suffered left shoulder pain for which she sought treatment from her PCP four times during the month of October 2018, and as soon as three weeks post-vaccination. Although she failed to report any left shoulder pain at an earlier appointment with her PCP, when treated for a severe headache and UTI, Petitioner otherwise (and thereafter) consistently attributed the left shoulder pain she complained of at these October appointments to the flu vaccine she received in September - indicating she had experienced soreness and pain since that time.

9

Apparently, Petitioner obtained some relief from the steroid injections administered by her orthopedist on October 30 and November 8, 2018 - she did not require treatment again until late January 2019. Consisting of one page or less per visit, the orthopedic records from this time provide little information regarding the cause and duration of Petitioner's should pain. There is only one entry, from Petitioner's first visit to the orthopedist on October 30, 2018, indicating Petitioner's left shoulder pain was not due to a self-inflicted injury. Exhibit 5 at 23.

During February and March 2019, Petitioner attended several PT sessions for treatment of left shoulder pain and was seen by a rheumatologist due to a concern that she suffered from lupus. The record from the initial PT visit on January 21, 2019, contains detailed information about the onset of Petitioner's pain on July 1, 2018, and a fall she suffered shortly before the visit. Exhibit 6 at 49. However, this information is not consistent with the information contained in numerous other medical records. In February 2019, both Petitioner and her orthopedist considered whether Petitioner's left shoulder pain could be connected to the possible lupus diagnosis. By April 2019, further testing had failed to support the lupus diagnosis.

Later medical records from the orthopedic surgeon who treated Petitioner beginning in April 2019, again reflect Petitioner's assertion that her left shoulder pain was due to her September 2018 vaccination. In these records, Petitioner consistently reported pain since vaccination.

The information provided in the medical record as a whole support Petitioner's claims regarding onset and duration. While arguing that Petitioner's assertions are unsupported, Respondent cherry-picks specific record entries, ignoring evidence to the contrary.

### A. Onset of Petitioner's Pain

When arguing that Petitioner has failed to establish that her left shoulder pain began within 48 hours of vaccination, Respondent emphasized the following:

1. the lack of any mention of shoulder pain when Petitioner sought treatment for a UTI and severe headache on September 28, 2018, two weeks post-vaccination;
2. the record from the initial PT evaluation, performed on January 21, 2019, which indicates the onset of Petitioner's left shoulder pain occurred six months earlier, on July 1, 2018; and

3. the entry from the orthopedic surgeon's record from a visit on April 17, 2019, which indicates Petitioner had been experiencing discomfort for more than a year (which if true would make onset before vaccination).

Rule 4(c) Report at 9. I address each such objection below.

### 1. Lack of a Report of Pain on September 28, 2018

Although Petitioner failed to mention any left shoulder pain during her late September visit for a severe headache and UTI, she did complain of such pain at four visits to her PCP in October 2018 – *all* within six weeks of vaccination. At each visit, Petitioner attributed the cause of her pain to the flu vaccine she had received in mid-September 2018. She described the level of her pain as mild, with a maximum severity of three out of ten, and reported that the pain was not improving or controlled with over-the-counter medications.

Given the severity of the headache and UTI pain Petitioner reported at the September visit, contrasted with the mildness of the left shoulder pain she reported in October, as well as the immediate need for treatment of those other illnesses, it is understandable that Petitioner would not have mentioned any left shoulder pain at this visit. Furthermore, in her affidavit, Petitioner indicated she "assumed the pain would go away on its own" (Exhibit 1 at ¶ 5), a reasonable assumption commonly made by petitioners suffering from SIRVAs. Thus, I find that there is preponderant evidence that Petitioner suffered from left shoulder pain since the date of vaccination.

### 2. Two Reports of Pain Onset Prior to Vaccination

The two entries indicating Petitioner's left shoulder pain began prior to vaccination are similarly outweighed by the greater evidence in the record. The later entry, from an April 2019 visit to the orthopedic surgeon, is especially weak, given that it indicates only that Petitioner had experienced discomfort for a year. Created approximately seven months post-vaccination, in the following calendar year, the entry is not a significant deviation from the multiple entries indicating a September 2018 onset.

Furthermore, there are no entries in the contemporaneously created medical records from prior to vaccination which refer to any shoulder pain, right or left, prior to vaccination. Thus, there is no support for these two entries identifying April and July 2018 onset dates. Because Petitioner believed, at that time, that she may be suffering from lupus, it is possible that she was including other areas of pain when providing these onset dates, for example the knee pain that she previously suffered. Or the entries may be due

11

to erroneous histories provided by Petitioner or histories incorrectly chronicled by the individual creating that portion of the medical record.

Regardless of their origin, these two entries are not sufficient to overcome the numerous entries, provided both before and afterwards, which identified the onset of Petitioner's left shoulder pain as the date of the September 2018 vaccination *or* the lack of contemporaneously created medical records to support an earlier April or July 2018 onset. Thus, I find the record establishes, by preponderant evidence, that Petitioner did not suffer left shoulder pain prior to receiving the flu vaccine in September 2018.

### B. Duration of Petitioner's Pain

Respondent based his assertion that Petitioner has not established that she suffered the residual effects of her SIRVA for more than six months upon the same January 2019 PT record containing the inaccurate information regarding the onset of Petitioner's pain and the medical record from Petitioner's initial visit to her rheumatologist in early February 2019. Rule 4(c) Report at 9-10. Respondent cited the history provided in the PT record, indicating Petitioner reported no pain for two and one-half weeks until she suffered a fall, as evidence that Petitioner's pain thereafter was due solely to the referenced fall. He maintains that the rheumatologist record, which indicates Petitioner reported the pain had 'just started recently,' attributing its source to a sprain as additional support for his assertion. *Id.* (quoting Exhibit 8 at 5).

However, both medical records were created during the time when Petitioner believed she was suffering from lupus, and the PT record Respondent relies upon has been shown to contain unreliable, possibly incorrect information. Additionally, when she returned to the rheumatologist, on March 11, 2019, Petitioner again attributed her left shoulder pain to her September 2018 vaccination. The medical record from that visit clearly notes that Petitioner reported "joint pain after flu shot . . . actually injected into her left shoulder joint." Exhibit 8 at 2. Thereafter, Petitioner consistently reported experiencing pain since receiving the flu vaccine in September 2018. *E.g.*, Exhibit 5 at 16. And the orthopedic surgeon who treated Petitioner twice in April, performing arthroscopic surgery on April 30, 2019, clearly viewed Petitioner's current left shoulder pain as a continuation of the pain she experienced in the late 2018. *See, e.g.*, *id.* at 15. Moreover, there is no indication in the surgical report of damage from a recent fall. *See id.* at 27.

Respondent's characterization of a complete resolution of Petitioner's left shoulder pain in late 2018, followed by a new injury and source of left shoulder pain from a fall, is not supported by the record in this case when viewed in total. Given that she was administered steroid injections on two occasions in late 2018, it is not surprising that

Petitioner experienced some temporary relief in early 2019. However, there is a dearth of evidence showing Petitioner obtained complete relief of her left shoulder pain *and then* suffered an injury significant enough to comprise the source of her later pain. I find the left shoulder pain Petitioner experienced in 2019 was a continuation of the left shoulder pain she experienced in 2018, following the administration of the flu vaccine.

### V.     Conclusion

As the Federal Circuit recently emphasized in *Kirby*, the holding in *Cucuras* "stands for the unremarkable position that it was not erroneous to give weight to contemporaneous medical records than to later, contradictory testimony." *Kirby,* 997 F.3d at 1382 (referencing *Cucuras*, 993 F.2d 1525). It does not mean that "medical records are accurate and complete even as to all physical conditions." *Id.* at 1383. A patient's motivation to provide accurate and truthful information to a treating physician "does not mean that he will report every ailment he is experiencing, or that the physician will accurately record everything he observes." *Kirby,* 997 F.3d at 1383. This admonishment is especially true when, as in this case, there are numerous entries in other medical records which contradict or expand on records otherwise-silent as to onset and severity.

The entries upon which Respondent relies were provided by Petitioner following a period of temporary relief when she believed she was suffering from lupus. However, in the clear majority of the medical records in this case, both Petitioner and her treating physicians describe left shoulder pain which began upon vaccination and continued past the six month mark needed to satisfy the Vaccine Act's severity requirement.

Considering the record as a whole, I find there is preponderant evidence to establish that the onset of Petitioner's pain occurred within 48 hours of vaccination, that Petitioner did not experience left shoulder pain prior to vaccination, and that Petitioner suffered the residual effects of her injury for more than six months. Specifically, I find the onset of petitioner's pain occurred the same day as her vaccination.

### VI.    Scheduling Order

In light of my findings regarding the onset of Petitioner's pain, the lack of any prior left shoulder pain, and the Vaccine Act's severity requirement, Respondent should consider his tentative position in this case. **Respondent shall file a status report indicating how he intends to proceed following my ruling or an amended Rule 4(c) Report by no later than <u>Friday, October 15, 2021</u>**. In the filing, Respondent also should indicate whether additional documentation is needed to support Petitioner's demand, previously conveyed on March 23, 2019. ECF No. 19.

Although I recognize Petitioner was unable to obtain sufficient relief from the conservative treatment she pursued and resorted to arthroscopic surgery, approximately seven months post-vaccination, to treat her left shoulder pain, I also note that, throughout her injury, the level of Petitioner's left shoulder was not significant. Thus, while awaiting Respondent's status report or amended Rule 4(c) Report, Petitioner should consider her earlier demand, make any needed revisions, and convey an amended demand to Respondent, if needed.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master